

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA



MARY FALONEY                          : CIVIL ACTION
404 Boggs Avenue, Apt. 1              :
Pittsburgh, PA 15211                  : No.: 07 CV 1455 JP
                                      :
           and                        :
                                      :
JAMES M. AND ANITRA WHITT, H./W.      :
1322 Sagmore Court                    :
Virginia Beach, VA  23464             :
   on behalf of themselves and        :
   all others similarly situated,     :
                          Plaintiffs  :
   v.                                 :
                                      :
WACHOVIA BANK, N.A.                   :
1 Wachovia Center                     :
Charlotte, NC 28288                   : JURY TRIAL DEMANDED
                      Defendant       :
_____:

## SECOND AMENDED COMPLAINT/CLASS ACTION

Plaintiffs Mary Faloney, James M. and Anitra Whitt bring this action pursuant to

18 U.S.C. § 1964(c) on their own behalf and behalf of all others similarly situated against

defendant Wachovia Bank, N.A. ("Wachovia") to recover threefold the damages incurred

by plaintiffs and the class as a consequence of defendant Wachovia's violation of 18

U.S.C. § 1962(d), and in support hereof, aver as follows:

## THE PARTIES

1.     Plaintiff Mary Faloney is an individual residing at 404 Boggs Avenue,

Apartment 1, Pittsburgh, Pennsylvania, 15211.  Plaintiff brings this action on her own

behalf and on behalf of all individuals similarly situated.

2.      Plaintiffs James M. and Anitra Whitt are individuals residing at 1322

Sagamore Court, Virginia Beach, Virginia, 23464. They bring this action on their own

behalf and on behalf of all individuals similarly situated.

3.      Defendant Wachovia Bank, N.A. (hereinafter "Wachovia") is a national

bank with its principal place of business in Charlotte, North Carolina. Wachovia, aware

that the payment processors described below were engaged in a telemarketing scheme to

defraud primarily the elderly, conspired with the payment processors by opening

accounts and clearing millions of dollars in remotely created drafts issued by the

processors and made out to the fraudulent telemarketers. Wachovia knew, *inter alia,* that

a significant number of these drafts were issued based upon banking information

fraudulently procured by telemarketers; that payment processors and remotely created

drafts were frequently used to advance fraudulent telemarketing schemes; that the

accounts it opened involved entities run by a convicted perpetrator of consumer fraud,

Donald Hellinger, who was repeatedly the subject of consumer fraud actions by the

federal government; and that Donald Hellinger and the persons associated with the

payment processor, Payment Processing Center, LLC, were the same persons who had

been associated with Netchex, a payment processor serviced by Wachovia that had

experienced an extraordinary return rate on the remotely created drafts that it had issued

on behalf of telemarketers, many of which were the subject of successful government

consumer fraud suits. Wachovia therefore obtained special agreements from its co-

conspirators according it protections beyond those provided by the Uniform Commercial

Code as a condition for continuing to maintain the accounts and participating in the

scheme. Further, Wachovia continued to participate in the scheme after being told by

other banks of the fraud and after another of its payment processor clients that served telemarketers, Amerinet, agreed to cease issuing remotely created drafts after a consumer fraud action brought by the attorneys general of Ohio, Florida, Illinois, North Carolina, and Vermont.

## OTHER PERSONS AND ENTITIES

4.      Payment Processing Center, LLC ("PPC") is a limited liability corporation established on December 8, 2004, under the laws of the Commonwealth of Pennsylvania. PPC was founded by Michael Weisberg and owned by Weisberg, Ronald and Donald M. Hellinger, Jami M. Pearlman and Mary O'Keefe Quigley. PPC is not named as a defendant herein.  Under alternative allegations, PPC is a "person" as that term is used in 18 U.S.C. § 1961(3), an "enterprise" as that term is used is 18 U.S.C. § 1961(4), and/or part of an "enterprise-in-fact" as that term is used is 18 U.S.C. § 1961(4).

(a)      As described below, PPC was a payment processor.  Its primary activity was the issuance and depositing of remotely created demand drafts on behalf of fraudulent telemarketers;

(b)      A large number of the companies that used PPC as a payment processor have been the subject of state and federal law enforcement involving consumer fraud;

(c)      PPC itself and its officers and owners were the subject of the action, *United States v. Payment Processing Center, et al.*, No. 06-725, in which its continuing activities were enjoined and its assets seized.

3

5.      Netchex (or Netchex Corporation or Net Holdings Corporation) was part of a group of entities including Universal Payment Solutions and Check Recovery Systems, which are collectively known by law enforcement authorities as the "Newtown Platform." They operated out of a common address in Newtown, Pennsylvania. The exact structure of those entities is not known to plaintiffs, but on July 15, 2004, Check Recovery Systems announced in a press release that the three constituent companies identified above as part of the Newtown Platform had been merged into a single company. On December 23, 2005, the Pennsylvania Secretary of State shows Net Holdings Corporation (a successor corporation to Netchex Corporation) being merged into CRS Holdings, Inc., and identifying Jami Pearlman as President. Prior to that date, Netchex Corporation was registered as a corporation with the Pennsylvania Secretary of State and with the same address in Newtown, Pennsylvania as that of CRS Holdings Corporation. For the purpose of this complaint, the collective entity and its payment processing product are collectively referred to as "Netchex." Netchex was founded on or about 2001 by Donald Hellinger. Netchex is not named as a defendant herein. Under alternative allegations, Netchex is a "person" as that term is used in 18 U.S.C. § 1961(3), an "enterprise" as that term is used is 18 U.S.C. § 1961(4), and/or part of an "enterprise-in-fact" as that term is used is 18 U.S.C. § 1961(4).

(a)      As described below, Netchex was a payment processor. Its primary activity was the issuance and depositing of remotely created demand drafts on behalf of fraudulent telemarketers;

(b)    A large number of the companies that utilized Netchex as a payment processor have been the subject of state and federal law enforcement involving consumer fraud.

6.    Each of the telemarketers set forth below (a) was the subject of successful consumer fraud proceedings by the federal government or by the attorney general of one or more states; (b) was involved in a scheme to fraudulently obtain victims' bank account information; (c) used Netchex and/or PPC to process payments; and (d) cleared remotely created demand drafts through defendant Wachovia:

(a)    Harijinder Sidhu, Joseph F. LaRosa, Jr., and Brian MacGregor are individuals who, through a group of related entities and use of fictitious names, have engaged in fraudulent telemarketing activities. The entities and names used by Sidhu, LaRosa, and MacGregor include the following: Universal Premium Services, Inc., also known as Premier Benefits, Inc., is a California corporation. It transacts business at various mail drop addresses in California under the names Premier Benefits, Buyer's Union, Premier Movie Pass, and Call-One Unlimited Communications. Consumer Reward Network, Inc. is a California corporation. It transacts business at various mail drop addresses in California under the names Star Communications, Consumer Health Reward Network, Health Network Unlimited, AutoGold, Net4Ever, Family Fun Pass, Mega Movie Pass, and Half Price TV. Star Communications LLC is a California limited liability company. It transacts business at various mail drop addresses in California under the names Star Communications, Family Fun Card, and Half Price TV. Membership Services Direct, Inc., also known as Continuity Partners, Inc., is a Nevada corporation. It has its principal place of business in Las Vegas, Nevada and maintains a place of

business in Malibu, California and does business under the names Continuity Partners, American Values, WellNet America, Washballs and Utalk Unlimited. Connect2USA, Inc. is a Nevada corporation. It has its principal place of business in Las Vegas, Nevada and maintains a place of business in Woodland Hills, California. Merchant Risk Management, Inc. is a Nevada corporation, with its principal place of business in Las Vegas, Nevada. Pantel One Corporation is a Nevada corporation, with its principal place of business in Las Vegas, Nevada. All Star Access, Inc. is a Colorado corporation and transacts business at various mail drops in Denver, Colorado and Las Vegas, Nevada under the names Movies Unlimited, Net Saver and Deluxe Holidays. Prime Time Ventures, Inc. is a Nevada Corporation and transacts business at various mail drops in Las Vegas, Nevada under the names That's Entertainment, VIP Holidays, Healthcare Plus and Protection Plus. These entities were the subject of *Federal Trade Commission v. Universal Premium Services, et al.*, CV06-0849 (C.D. Cal.). The FTC press release describing this action stated that "the defendants cold-called consumers falsely promising them valuable incentives … in order to get the consumers to disclose their bank account information."

(b)     Byron W. Wolf, Roy A. Eliasson, Alfred H. Wolf, Donald L. Booth, Jeffrey P. Wolf, and John Louis Smith II are individuals who, through a group of related entities and use of fictitious names, have engaged in fraudulent telemarketing activities. The entities and names used by them include the following: FTN Promotions, Inc. does business under the names: Suntasia Inc., Suntasia Marketing, Inc., and Capital Vacations; Guardian Marketing Services Corp. does business under its own name and under the name Guardian Escrow Service; Strategia Marketing, LLC; Co-Compliance,

LLC; JPW Consultants, Inc. does business under the names Freedom Gold, Variety!, Credit Life, and Freedom Ring ULD; Travel Agents Direct, LLC does business under the names Travel Agents Go Direct, Floridaway, Travel Life Go Direct, Florida Direct and Lucid Long Distance; Agent's Travel Network Inc. does business under the name Florida Passport; Bay Pines Travel, Inc; Suntasia Properties, Inc. These entities are the subject of *Federal Trade Commission v. FTN Promotions, Inc et al.*, No. 8:07 CV 1279-T30TGW (M.D. Fla.). The FTC press release of July 25, 2007, stated: "The essence of this massive telemarketing scheme was simple: trick people into giving out their checking account numbers…"

(c)     William H. Martell, Tracey A. Bascove, Mitchel Kastner, Ronald Corber, and Jason Castner are individuals who, through a group of related entities and use of fictitious names, have engaged in fraudulent telemarketing activities. The entities and names used by them include Sun Spectrum Communications Organizations Inc. d/b/a "Royal Credit Solutions," North American Communications Organization, Inc. d/b/a "Imperial Consumer Services," WWC12002, Inc. d/b/a "Beneficial Client Care," and 9106-7843 Quebec, Inc. d/b/a "Intelagent Media Inc." These entities were the subject of *FTC v. Sun Spectrum Communications Organization, Inc.* et al, 03-81105 Civ (S.D. Fla.). The FTC press release describing this action stated: "The FTC also alleges that the defendants violated the Gramm-Leach-Bliley Act by using false or fictitious statements to obtain consumers' bank account information."

(d)     Navin Baboolal and Annilla Ramkissoon are individuals who, through related entities and use of fictitious names, have engaged in fraudulent telemarketing activities. The entities and names used by them include Millenium

Consulting and Med Supply Xtel Marketing, Inc.  These entities were the subject of *FTC v. Xtel Marketing, Inc. et al.*, No. 04C 7238 (N.D. Ill.).  The FTC press release describing this action stated: "A Canadian enterprise that targets elderly consumers, dupes them into revealing their bank account information, then debits hundreds of dollars from their accounts is facing Federal Trade Commission charges that its operation violated federal law."

(e)    Paul Price, Elissa R. Price a/k/a Lisa Price and Lisa Wells, and Mishele Wells are individuals who, through a group of related entities and use of fictitious names, have engaged in fraudulent telemarketing activities.  The entities and names used by them include: 120194 Canada Ltd., which did business under the names Veritech Communications, Veritech Communication Services, Veritech, Prime One Benefits, Prime One Financial, Prime One, First National Credit Service, and U.S. National Credit; Prime One Financial Group, Inc., which did business under the names Prime One Benefits, Prime One Financial, Prime One, First National Credit Service, and U.S. National Credit; Marketing Directives, Inc., which did business under the names Ameriline and Ameriline Corp.; 1284383 Ontario Inc., which did business under the names, First National Credit Service and Direct Service Management; 1309529 Ontario Inc., which did business under the name U.S. National Credit; and Simax Corp., which did business under the names America's Gift House, Gold Universal, Ameriline, and Ameriline Corp.  These entities were the subject of *FTC v. 120194 Canada, Ltd. et al.* 1:04-cv-07204 (N.D. Ill.)

(f).    Oleg Oks a/k/a Oleg A. Oks and Oleg Alex Oks, Aleksandr Oks, Philip Nemirovsky, and Boris Pekar are individuals who, through a group of related

entities and use of fictitious names, have engaged in fraudulent telemarketing activities.
The entities and names used by them include: 1530605 Ontario, Inc. which did business
under its own name and also under the name Pacific Liberty; 1559927 Ontario, Inc.,
which did business under its own name and also under the names Pacific Liberty Group
and Pacific Liberty Liberty W Group; 1565205 Ontario Inc., which did business under its
own name and also under the names: Pacific Liberty and Pacific Liberty W; 1585392
Ontario Inc., which did business under its own name and also under the names: Liberty
Wide Info Services, Liberty Wide Info Services Group, Liberty Wide Services and
Liberty Wide; 1620142 Ontario Inc., which did business under its own name and also
under the names, Liberty Sun Info Services and Liberty Sun Info; 1619264 Ontario Inc.,
which did business under its own name and also under the name C&B Communications
Group; 1629930 Ontario Inc. which did business under its own name and also under the
names, Atlantic One Info Services Grp and Atlantic One Info Services Group; 1485635
Ontario Inc., which did business under its own name and also under the names
Nationwide Credit Service Inc., Nation Wide Information Services Group Inc., and
Nationwide Information Services. These entities were the subject of *FTC v. Oleg Oks, et
al.*, No. 05C 5389 (N.D. Ill.).

      (g)    Donald J. Lasker, Bonnie Kriebel a/k/a Bonnie Lasker are
individuals who, through related entities and use of fictitious names, have engaged in
fraudulent telemarketing activities. The entities and names used by them include Frankly
Speaking, Inc. and Plasticash. These entities were the subject of *FTC v. Frankly
Speaking, Inc. et al*, No. 1:05-cv-60 (M.D. Ga.).

(h)    Advantage America, operates under the following names:  First National Benefits, First Government Grants, First National Health Care, Titan Financial, First National Government Grants, AIG Limited, Premier Health Benefits, First National Health Care Limited, and First National Benefits. Advantage America was the subject of a cease and desist order obtained by the Attorney General of North Dakota.

(i)    GSI Grant Services, a Barbados entity, is identified as a fraudulent telemarketer in *United States v. Payment Processing Center,* et al, Case No. 06-725.

(j)    Your Choices, Inc. was the subject of proceedings brought by the attorneys general of Vermont, Florida, North Carolina, and Ohio resulting in the termination of remote demand draft processing by AmeriNet.  It is identified as a fraudulent telemarketer in *United States v. Payment Processing Center, et al.*, No. 06-725.  The press release issued by the North Carolina Attorney General issued November 3, 2005, described the Amerinet scheme, which used accounts at defendant Wachovia, as follows: "According to Cooper's complaint against the company, AmeriNet debited consumers' bank accounts on behalf of telemarketers pitching advance-fee loans and credit cards, credit repair, government grants and other bogus products. As many as 80 percent of people who had their accounts debited sought to have the money credited back to their bank accounts—a sign that many of these debits were not authorized by customers.  Despite the high return rate, AmeriNet continued to provide services to the telemarketers.  The complaint also alleges that AmeriNet processed unsigned checks without prior written authorization from consumers and processed electronic debits based on first-time cold telemarketing calls."

(k)    Consumer Grants USA was the subject of a consumer fraud action brought by the Attorney General of North Carolina. A default judgment was entered in that action on July 29, 2005. *State of North Carolina v. Consumer Grants USA, Inc. et al.*, No. 05 CVS 04732 (Wake County, NC). Consumer Grants USA was also the subject of a consumer fraud action by the Attorney General of Massachusetts in 2005 resulting in an injunction enjoining its continued operations in Massachusetts and imposing fines. The Massachusetts Attorney General's press release described the fraud: "The telemarketers told consumers that they had been 'chosen' or 'approved' for a government grant, typically for as much as $8,000. They then convinced the consumers to authorize withdrawals from their bank accounts to cover 'processing fees' of typically, $249 to $259. After the fees were withdrawn, the only thing the consumers received in return was a booklet with listings of available government grant programs."

(m)    Continuity Partners was the subject of separate consumer fraud actions by the Attorneys General of Ohio, Iowa, Oregon, and Wisconsin over a two-year period beginning in 2004. In the Ohio action, it agreed to entry of a consent judgment on or about January 18, 2006, acknowledging its consumer fraud including fraudulent use of demand drafts. The Iowa Attorney General's press release described the fraud: "They agreed to give their bank account number for the $1.95 payment to receive $200 in so-called gas coupons, but they rejected other offers. Nevertheless, unauthorized charges showed up on their bank or debit accounts.... Miller's office said the so-called $200 of 'gas coupons' appear to be of little or no practical value."

The individuals and entities referred to in this paragraph are collectively referred to as "the Telemarketers." The Telemarketers are not named as defendants herein, but

each entity is an "enterprise" as that term is used in 18 U.S.C. § 1961(4), and collectively were part of an "enterprise-in-fact" as that term is used in 18 U.S.C. § 1961(4).

7.      Donald M. Hellinger ("D. Hellinger") is an individual residing at 1748 Quarry Road, Yardley, Pennsylvania.  He was the founder of Netchex and the Newtown Platform and formulated, directed, controlled, or participated in the acts and practices of both Netchex and PPC of which he was also an owner.  D. Hellinger is not named as a defendant but is, under alternative allegations, a "person" as that term is used in 18 U.S.C. § 1961(3) and part of an enterprise-in-fact under 18 U.S.C. § 1961(4).

(a)      D. Hellinger had a long history of association in fraudulent marketing schemes and other aspects of fraudulent direct marketing.

(i)      In 1989, he was convicted of tax evasion and mail fraud in connection with a "cents off coupon" consumer fraud scheme.

(ii)      In 1995, he settled Federal Trade Commission allegations that he had engaged in the deceptive promotion of credit cards and other products via "900 numbers."  His settlement with the FTC enjoined him from engaging in consumer fraud, and in assisting others that he knows, or should know, are engaged in consumer fraud.

(iii)      Notwithstanding his agreement with the FTC, he is the owner of Choices Unlimited, LLC, a company that from 1998 until 2004 operated out of the same location as Netchex, and thereafter, operated out of the same location as PPC. Choices Unlimited, LLC, provides fraudulent telemarketers with the names and telephone numbers of individuals who have been victimized by fraudulent telemarketers, and/or

whom it has determined are particulary susceptible to fraudulent telemarketing schemes. It sells such lists, among other places, through Walter Karl, a subsidiary of InfoUSA, Inc.

(iv)    The United States Attorney for the Eastern District of Pennsylvania alleges in its Amended Verified Complaint for Injunctive Relief in *United States v. Payment Processing Center*, No. 06-725, that D. Hellinger frequently travels to Montreal, Quebec, where, the Government believes, he continues to be involved in fraudulent telemarketing schemes.

8.    Michelle O'Keefe Quigley ("Quigley") is an individual residing at 12097 Legion Street, Philadelphia, Pennsylvania.  Quigley was the Chief Financial Officer of both Netchex and PPC, as well as an owner of both PPC and Netchex.  She formulated, directed, controlled, or participated in the acts and practices of both Netchex and PPC. Quigley is not named as a defendant, but is under alternative allegations a "person" as that term is used in 18 U.S.C. § 1961(3) and part of an enterprise-in-fact under 18 U.S.C. § 1961(4).

(a)    Like D. Hellinger, Quigley had a history of fraudulent marketing schemes.

(i)    Doing business as Prophets, Inc., Quigley conducted a fraudulent direct mail marketing scheme under the names "Madame Arielle Dupont," Institute of Astrological Research," and "Sweepstakes Claim Center" from the common address of 301 Oxford Valley Road, Yardley, Pennsylvania.

(ii)    After investigation by the United States Postal Service Inspection Service, and pursuant to a civil seizure warrant, Quigley relinquished $92,527 of proceeds from her fraudulent schemes.

9.      Michael Weisberg ("Weisberg") is an individual residing at 2 Kanon Court, Newtown, Pennsylvania. Weisberg was the founder and an owner of PPC. Before founding PPC, Weisberg was employed by Netchex. At both entities, Weisberg's duties included establishing accounts and business agreements with telemarketers, performing due diligence on said telemarketers and managing their relationships with banks including defendant Wachovia. Weisberg is not named as a defendant, but under alternative allegations is a "person" as that term is used in 18 U.S.C. § 1961(3) and part of an enterprise-in-fact under 18 U.S.C. § 1961(4).

10.     Jami M. Pearlman ("Pearlman") is an individual residing at 4 Hampshire Drive, Warminster, Pennsylvania. Pearlman was an owner and employee of PPC. Before joining PPC, Pearlman was President and Chief Operating Officer and owner with D. Hellinger of Netchex. Pearlman formulated, directed, controlled, or participated in the acts and practices of both PPC and Netchex and had particular responsibility for performing due diligence on the telemarketers and managing PPC's relationships with banks. Pearlman is not named as a defendant but under alternative allegations is a "person" as that term is used in 18 U.S.C. § 1961(3) and part of an enterprise-in-fact under 18 U.S.C. § 1961(4).

11.     Ronald Hellinger ("R. Hellinger") is an individual residing at 58 Polder Drive, Langhorne, Pennsylvania. R. Hellinger was an owner of PPC. R. Hellinger is D. Hellinger's twin brother. Before PPC was created, R. Hellinger was employed by Netchex. At both entities, R. Hellinger's duties included establishing accounts and business agreements with telemarketers, performing due diligence with said telemarketers and managing their relationships with banks including defendant Wachovia. R. Hellinger

is not named as a defendant but under alternative allegations is a "person" as that term is defined in 18 U.S.C. § 1961(3) and part of an enterprise in fact under 18 U.S.C. § 1961 (4).

## JURISDICTION AND VENUE

12.     Plaintiffs bring this action pursuant to 18 U.S.C. § 1964(c), which confers jurisdiction upon this Court over the subject matter of this action.

13.     The Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

14.     Venue in this district is proper pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b), in that defendant Wachovia is subject to personal jurisdiction in this district and therefore resides in this district (28 U.S.C. § 1391(c)), is found and transacts its affairs in this district, and a substantial part of the events and omissions giving rise to the claims in this action occurred in this district.

## THE CLASS

15.     The Class consists of all individuals in the United States as to whom remotely created demand drafts (hereinafter "demand drafts") on their bank accounts were prepared and deposited by PPC or Netchex into one or more accounts in either of their names at defendant Wachovia during the period June 6, 2003, through February 21, 2006, and finally charged to the class members' bank accounts pursuant to information provided to PPC or Netchex by one or more of the Telemarketers, or who otherwise incurred any bank charges as a consequence of such demand drafts.

**BACKGROUND FACTS**

16.    During the period from at least 2001 through February 21, 2006, when this Court issued its temporary restraining order against PPC and its officers in *United States v. Payment Processing Center, LLC*, Netchex and PPC were payment processors that provided fraudulent telemarketing merchants, including the Telemarketers, with services for processing bank draft transactions resulting from telephone transactions.  The majority of their clients were telemarketers.

17.    Both Netchex and PPC were able to process remotely created bank draft transactions as a result of accounts at, and agreements with, Wachovia.  Certain of these agreements provided protections to Wachovia far beyond those provided by the Uniform Commercial Code and were intended to insulate Wachovia for any losses and/or liability arising from the servicing of the remotely created drafts deposited in the accounts. Internal communications within Wachovia state that such agreements were entered into where Wachovia knew that the payment processors' clients included fraudulent telemarketers and that drafts generated by such telemarketers would be cleared through Wachovia.

18.    Telemarketing refers to the professional use of the telephone to advertise, market and/or provide services to both individual consumers and businesses.

19.    By its nature, telemarketing is susceptible to being used by unscrupulous persons and companies, including the Telemarketers, to defraud consumers, such as plaintiffs and the members of the class, including schemes to obtain information concerning their bank accounts, allowing unscrupulous telemarketers, including the

16

Telemarketers, to take money from the victims' bank accounts and transfer it to themselves. Fraudulent telemarketing schemes begin with unsolicited telephone calls made in interstate and foreign commerce. During the calls, victims, such as plaintiffs and the members of the class, are induced, through misrepresentations and false promises of goods and services, to provide unscrupulous telemarketers, including the Telemarketers, with personal bank account information. Unscrupulous telemarketers, including the Telemarketers, use false, misleading and high-pressure sales scripts to induce victims such as plaintiff and the members of the class to agree to purchase products and services of negligible or wildly exaggerated value. The unscrupulous telemarketers, including the Telemarketers, then transmit the personal bank account information through the United States mail and/or interstate wire and foreign wires to payment processors, including Netchex and PPC. Had the victims of the unscrupulous telemarketers, including the Telemarketers, known that the promises and representations made to them were false and fraudulent, they would not have disclosed their personal bank account information. The most common victims of fraudulent telemarketers are senior citizens. The AARP, the National Association of Attorneys General and the Federal Trade Commission have estimated that 85 percent of the victims of fraudulent telemarketing are age 65 or older.

20.     Once having fraudulently obtained a consumer's bank account information, fraudulent telemarketers, including the Telemarketers, need a mechanism by which to withdraw funds from the accounts of their victims.

21.     To collect and receive money from the accounts of their victims, including plaintiffs and the members of the class, fraudulent telemarketers, including the Telemarketers, contract with payment processors such as Netchex and PPC. Payment

17

processors establish an account in their own name with a bank and using information regarding victims' bank accounts that is provided by the telemarketers, collect payments from the victims into that account. After receiving funds from the victims in its account, the payment processor deducts a fee for itself and transmits the balance to the telemarketer.

22.    A payment processor can use one of two methods to obtain payment based on the bank information of a consumer obtained and provided by a telemarketer: (1) an electronic transfer through an Automated Clearing House debit ("ACH"), or (2) a remotely created paper check referred to herein as a "demand draft." However, ACH electronic transfer transactions are subject to rules of the National Automated Clearing House Association ("NACHA"), and cannot, pursuant to those rules, be used for transactions on behalf of businesses engaged in outbound telemarketing calls to consumers with whom they have no existing relationship. Typically, fraudulent telemarketing transactions fall into that category. Such telemarketers, including the Telemarketers, therefore, rely instead on demand drafts as a payment device in which payment processors, such as Netchex and PPC, create and deposit the demand draft.

23.    A demand draft is an unsigned paper check that, in lieu of a signature, bears a printed notice stating "authorized by drawer" or similar language. Payment processors, such as Netchex and PPC, create such drafts payable to the telemarketers, using the person's bank routing and account information as provided by the telemarketer and deposit such drafts in the payment processors' accounts. The payment processor also includes a legend stating that it is authorized by the person to prepare the demand draft without the requirement of a signature. On its website, PPC expressly promoted its

services to telemarketers as including the ability to process, "Bank draft originations for telephone transactions that may be prohibited by NACHA rules," and "customer not present" or "high risk" transactions. PPC expressly identified "Outbound Telemarketing," such as that engaged in by the Telemarketers, as transactions prohibited under NACHA rules.

24.     Demand drafts are well known to be used by unscrupulous telemarketers to perpetrate consumer fraud. The attorneys general of 35 states, the District of Columbia, and American Samoa have called upon the Board of Governors of the Federal Reserve System to eliminate such drafts because they are so frequently used to perpetrate fraud on consumers.

## FACTS GIVING RISE TO THIS ACTION

25.     Each of the Telemarketers has, during the class period, engaged in fraudulent telemarketing schemes whereby they were able to obtain the bank account information of their victims, including plaintiffs and the members of the class, necessary to have demand drafts prepared on the victims' accounts.

26.     As discussed above, each of the Telemarketers has been the subject of a successful government consumer fraud action. For example, in May 2006, the Federal Trade Commission brought an action against certain of the Telemarketers, collectively believed to be PPC's largest customer, and others in the United States District Court for the Central District of California (Case No. CV06-0849 SJO) alleging violations of the Federal Trade Commission Act, 15 U.S.C. §§ 53(b) and 57b, the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S. C. §§ 6101-6108, and the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3001 *et seq.*

27.     On March 17, 2006, the District Judge in the California action signed an Amended Order Granting Plaintiff Federal Trade Commission's Application for Preliminary Injunction and Appointment of Permanent Receiver.  In his order, the judge concluded that the FTC was likely to succeed on its claims.  For example, the court found: "Defendants fail to sufficiently dispute that they made numerous misrepresentation to consumers to induce them to disclose their bank account information so as to obtain authorizations to debit their bank accounts."  The court also found that: "Defendants caused customers' billing information to be submitted for payment without express and informed consent of the customer."  Similar orders were entered in the other actions identified above involving the Telemarketers.

28.     In or about November 2005, the Attorney General of North Dakota issued a Cease and Desist Order against Telemarketer Advantage America and others who, with false and fraudulent promises of government grants, induced victims to provide them their bank account information for purposes of paying a so-called "processing fee".

29.     Each of the Telemarketers retained PPC and/or Netchex as its payment processor.  Each of the Telemarketers provided PPC and/or Netchex with the fraudulently obtained account information of its victims, including plaintiffs and the members of the class.  PPC and/or Netchex then used that information to prepare demand drafts payable to the Telemarketers drawn on the victims' accounts and deposited those demand drafts in accounts maintained by defendant Wachovia for PPC and/or Netchex.  Once payment was credited to defendant Wachovia by the victims' banks, PPC and/or Netchex retained a portion of the funds received as its fee and remitted the balance, usually by wire

transfer, to the Telemarketers.  Such services by PPC and/or Netchex and defendant

Wachovia were critical to the fraudulent marketing schemes of the Telemarketers.

30.    As a result of such fraudulent transactions, funds were withdrawn from the

accounts of plaintiffs and the class members without their knowledge or informed

authorization and consent, and deposited into accounts opened by defendant Wachovia

for PPC and/or Netchex.  In other instances in which the accounts did not have sufficient

funds to cover the demand drafts, class members were charged by their banks for having

demand drafts and other legitimate checks drawn on accounts with insufficient funds.


### FACTS AS TO PLAINTIFFS

#### A.    Mary Faloney

31.    Plaintiff Faloney is a disabled grandmother whose income consists of

monthly SSI benefits that are directly deposited into her account at Citizens Bank.

Because of her low income, Mrs. Faloney is vulnerable to interference with her monthly

cash flow.

32.    In or about November or early December 2005, Mrs. Faloney received an

unsolicited telephone call from a representative of Telemarketer GSI Grant Services

Incorporated ("GSI").  The caller falsely and fraudulently said that he could give her a

$5000 government grant, which she would not have to pay back.  Upon questioning by

Mrs. Faloney, the caller stated that there was a $298 charge that he falsely and

fraudulently represented she could later recoup from the $5000 grant.  The caller then

asked for and received Mrs. Faloney's bank account number at Citizens Bank.  Mrs.

Faloney was falsely and fraudulently promised that she would receive a package and a

book in the mail in approximately two weeks, with material for her to sign and return. She was further falsely and fraudulently promised that approximately three weeks thereafter, the $5000 would appear in her account. Had Mrs. Faloney known that the promises and representations made to her were false and fraudulent, she would not have provided her bank account information.

33.     On or about December 19, 2005, $298 was charged to Mrs. Faloney's account at Citizens Bank as a result of a demand draft created by PPC that it deposited into a PPC account at defendant Wachovia. However, Mrs. Faloney received no materials from GSI, nor was $5000 or any other "grant" sum deposited into her account.

34.     In or about March 2006, Mrs. Faloney received a second telephone call from a representative of GSI, apologizing for the earlier incident and falsely and fraudulently offering a grant of $8,000 for an additional payment of $69. Mrs. Faloney advised the caller that her account had been closed. In a mailing dated March 15, 2006, plaintiff received from GSI a paper bound book entitled "Your Guide to Government Grants," a CD disk with the same title, and a gift certificate from an entity identified as "World of America," which certificate had no value to Mrs. Faloney.

35.     In or about December 2005, Mrs. Faloney also received an unsolicited telephone call from Telemarketer Capital Financial. The caller falsely and fraudulently promised Mrs. Faloney a credit card and four $50 gift certificates for a payment of $200. After Mrs. Faloney provided the caller with her bank account number, $200 was charged to her account at Citizens Bank on or about December 30, 2005, by demand draft, and deposited into a PPC account at defendant Wachovia. Had Mrs. Faloney known that the

promises and representations made to her were false and fraudulent, she would not have provided her bank account information.

36.     The "credit card" and gift certificates were received by Mrs. Faloney in a mailing postmarked January 17, 2006.  However, both the credit card and the gift certificates were worthless.

37.     As a result of the events described above, as of January 10, 2006, funds were improperly withdrawn from Mrs. Faloney's account at Citizens Bank, she lost the use of those funds over a period of time, her account was overdrawn, and she incurred overdraft fees of at least $175.

## B. Anitra Whitt and James M. Whitt

38.     Plaintiffs Anitra Whitt and James M. Whitt are a married couple having four children, 6 months through five years old.  At the time the events giving rise to this action took place, Mrs. Whitt was a member of the United States Air Force stationed at Langley Air Force Base, Virginia.

39.     On or about May 13, 2005, James M. Whitt received a telephone call from a representative of GSI.  The caller falsely and fraudulently said that Mr. Whitt was guaranteed a $6,000 government grant.  The caller stated that there was a $298 charge that he falsely and fraudulently represented he could later recoup from the grant.  The caller then asked for and received Mr. and Mrs. Whitt's bank account number at Langley Federal Credit Union.  Had Mr. Whitt known that the promises and representations made to him were false and fraudulent, he would not have provided the bank account information to the caller.

40.    On or about May 15, 2005, $298 was charged to the Whitt's account at Langley Federal Credit Union as a result of a demand draft created by PPC made out to GSI that was deposited into PPC account 2000018538232 at defendant Wachovia.

41.    The Whitts subsequently received from GSI a paper bound book entitled "Your Guide to Government Grants" and a CD disk with the same title.  The book did not list any government entities in Virginia that gave government grants, and when Mrs. Whitt called other entities listed in the book they all advised her that she and her husband were not eligible for any government grant for their business.  The book and CD were, in fact, valueless.

42.    Mrs. Whitt subsequently tried to obtain a refund of her money from GSI and was not successful.

43.    As a result of the events described above, funds were improperly withdrawn from Mr. and Mrs. Whitt's account at Langley Federal Credit Union. Mr. and Mrs. Whitt lost the $298, the use of those funds over a period of time, their account was overdrawn, and they incurred overdraft fees of at least $600.

## CLASS ACTION ALLEGATIONS

44.    The Class consists of all individuals in the United States as to whom demand drafts on their bank accounts were prepared and deposited by PPC or Netchex into one or more accounts in either of their names at defendant Wachovia during the period June 6, 2003, through February 21, 2006, and finally charged to the class members' bank accounts pursuant to information provided to PPC or Netchex by one or

more of the Telemarketers, or who otherwise incurred any bank charges as a consequence of such demand drafts.

45.    The class is so numerous that joinder of all members is impracticable. Class members are located throughout the United States. Between June 6, 2003, and August 2004,  Netchex deposited approximately $58 million into one account at defendant Wachovia. Between April 2005 and December 2005, PPC deposited approximately $142 million dollars of demand drafts into accounts it maintained at defendant Wachovia.  Since the amount of a typical demand draft transaction was relatively small, it is reasonable to believe that the class numbers in the thousands—if not tens of thousands.

46.    Plaintiffs are adequate representatives of the class and their claims are typical of those of the class.  There are no issues or defenses unique to plaintiffs, and plaintiffs have no conflicts with the members of the class.  Counsel for plaintiffs are experienced in the prosecution of complex class action litigation and have appeared as counsel and as lead counsel in nationwide class actions in courts across the United States.

47.    There are questions of law and fact that are common to the class and that predominate over any issues affecting only individual members.  Common questions of fact include the use by the Telemarketers of phones and wires to fraudulently obtain bank account information from the class members; the transmission of such fraudulently obtained information by phone and wire by the Telemarketers to PPC and/or Netchex in order to have PPC and/or Netchex prepare and process for payment fraudulent demand drafts; the participation of PPC and/or Netchex in the operation and management of the Telemarketers by reviewing scripts and providing them with essential processing services

using fraudulently obtained bank information; the knowledge of PPC and/or Netchex that they were participating in the operation and management of enterprises engaging in a pattern of racketeering activity; the fraudulent use by PPC of the mails and wires to participate in the operation and management of the Telemarketers by providing review of scripts and processing services using fraudulently obtained bank information; and the agreement of defendant Wachovia to assist PPC and/or Netchex in providing processing services by opening accounts for PPC and/or Netchex accepting and submitting for payment fraudulently prepared demand drafts using fraudulently obtained bank information, and crediting the accounts of PPC and/or Netchex with the proceeds of such fraudulent transactions.  Common questions of law include whether PPC and/or Netchex violated 18 U.S.C. §§ 1029(a)(2) and (a)(3), 1029(b)(2), 1344, and 1962(c) and whether Wachovia conspired with PPC in violation of 18 U.S.C. § 1962(d).

48.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The individual claims of the class members are too small to warrant their bringing individual actions.  To the best of plaintiffs' knowledge there is no other action brought on behalf of the class against defendant Wachovia.  PPC was a defendant in a civil action brought against it by the United States based on the conduct alleged herein, had been preliminarily enjoined by this Court in Civil Action No. 06-725, and has entered into a consent judgment in that action.  It is desirable, therefore, for this litigation to proceed in this Court, which is already familiar with the background of this lawsuit.  There should be no difficulties in the management of this action as a class action, since much of the information needed to identify the class

has already been obtained by the United States and additional information should be readily obtainable by discovery from PPC and/or Netchex and defendant Wachovia.

## VIOLATIONS OF 18 U.S.C. §1962(c)

### VIOLATIONS BY D. HELLINGER
### R. HELLINGER, QUIGLEY, WEISBERG AND PEARLMAN

49.     D. Hellinger, R. Hellinger, Quigley, Weisberg, and Pearlman are persons as defined in 18 U.S.C. § 1962(3).

50.     PPC and Netchex are enterprises or an enterprise as defined in 18 U.S.C. § 1962(4).

51.     D. Hellinger, R. Hellinger, Quigley, Weisberg, and Pearlman participated in the conduct of the affairs of the each of the enterprises identified in paragraph 50 above from at least 2001 through at least February 2006 through a "pattern of racketeering activity" as that phrase is defined in 18 U.S.C. § 1961(5).

52.     Netchex and PPC shared common officers, stockholders, and Telemarketers and performed the same activities as described above.  Each of the entities was an essential element in a common fraudulent enterprise whereby the Telemarketers fraudulently obtained the bank account information from individuals pursuant to the methods described above and forwarded that information to Netchex, during the period beginning in 2001 through at least late 2004, and to PPC, from the period beginning early 2005 through February, 2006.  Netchex and PPC, with knowledge of the criminal conduct of the Telemarketers as described in paragraphs 56 through 58 hereof, or with willful disregard thereof, provided the necessary processing services to convert the information

obtained by the Telemarketers into cash, using the fraudulently obtained access devices to prepare demand drafts and to deposit them in its accounts with defendant Wachovia. Netchex and PPC reviewed scripts provided to them by one or more of the Telemarketers, which they knew to be used fraudulently to obtain access devices from plaintiffs and the members of the class and fraudulently represented to law enforcement officials that no charges were made to an account of a customer of the Telemarketers unless independent verification was conducted with the customer. In fact, many if not all of those supposed verifications were conducted by the Telemarketers, not Netchex or PPC, and were themselves fraudulent. Notwithstanding their knowledge and warnings received from law enforcement agencies, consumers, and banks, Netchex and PPC continued to provide the processing services essential to the fraudulent telemarketing scheme.

53.     Plaintiffs specifically reallege that D. Hellinger was the founder and primary shareholder of Netchex; Pearlman was the Chief Operating Officer; Quigley was the Chief Financial Officer and part owner; R. Hellinger and Weisberg were key sales and technical employees. All shared in the profits of Netchex.

54.     After selling Netchex to a third party, D. Hellinger and Weisberg formed PPC. Ultimately, D. and R. Hellinger, Weisberg, Pearlman and Quigley were the primary owners of PPC. Quigley was its Chief Financial Officer. All were involved in the day to day operations of PPC and shared in its profits.

55.     D. Hellinger, at the same time, through an entity known as Choices Unlimited, LLC, which was in the business of generating and trading in telemarketing prospect lists, also furnished the Telemarketers, or certain of them, with the names and

phone numbers of individuals who had already been victimized by fraudulent telemarketers and were believed to be susceptible to such schemes.

56.     The account numbers and bank routing information fraudulently obtained by the Telemarketers from plaintiffs and the members of the Class and transmitted first to Netchex and then to PPC are "access devices" as that term is defined in 18 U.S.C. § 1029(e)(1).  Those access devices were obtained by the Telemarketers with intent to defraud as alleged in paragraphs 17 through 24 and 25 through 30 above, which are incorporated herein by reference.  They were, therefore, "unauthorized access devices" as that phrase is defined in 18 U.S.C. § 1029(e)(3).

57.     The Telemarketers, individually and collectively, knowingly and with intent to defraud, trafficked in and used many thousands of unauthorized access devices identified in paragraph 56 hereof during a one-year period, and by such conduct, obtained funds from plaintiff and the members of the class aggregating in the millions of dollars. The Telemarketers, individually and collectively, with intent to defraud also possessed many thousands of unauthorized access devices as described in paragraph 56 hereof.

58.     The conduct of the Telemarketers described in paragraph 57 hereof constituted multiple violations of 18 U.S.C. §§ 1029(a)(2) and (a)(3).

59.     D. Hellinger, R. Hellinger, Quigley, Weisberg, and Pearlman, with knowledge of the criminal conduct of the Telemarketers as described in paragraphs 56 and 57 hereof, or with willful disregard thereof, agreed to provide processing services to the Telemarketers through Netchex and PPC, using the fraudulently obtained access devices to prepare demand drafts and deposit them in its accounts with defendant Wachovia.  PPC and, upon information and belief, Netchex, reviewed scripts provided by

29

one or more of the Telemarketers, which it knew to be used fraudulently to obtain access

devices from plaintiffs and the members of the class, and fraudulently represented to law

enforcement officials that no charges were made to an account of a customer of the

Telemarketers unless independent verification was conducted with the customer.  In fact,

many if not all of those supposed verifications were conducted by the Telemarketers, not

Netchex or PPC, and were themselves fraudulent.  Notwithstanding their knowledge, and

warnings received from law enforcement agencies, consumers, and banks, D. Hellinger,

R. Hellinger, Quigley, Weisberg, and Pearlman through Netchex and PPC continued with

their agreements to provide processing services to the Telemarketers.

60.    The conduct of D. Hellinger, R. Hellinger, Quigley, Weisberg, and

Pearlman through Netchex and PPC constituted multiple violations of 18 U.S.C.

§§ 1029(a)(2) and (a)(3), which violations are predicate offenses for purposes of 18

U.S.C. § 1962(c).

61.    D. Hellinger, R. Hellinger, Quigley, Weisberg, Pearlman, Netchex, and

PPC conspired with each of the Telemarketers to commit the offenses alleged in

paragraphs 58 and 60 hereof, in violation of 18 U.S.C. §1029(b)(2), which conspiracies

are predicate offenses for purposes of 18 U.S.C. § 1962(c).

62.    The conduct of D. Hellinger, R. Hellinger, Quigley, Weisberg, Pearlman,

Netchex, and PPC as described in this complaint constituted the execution of a scheme

and artifice to obtain by means of fraudulent pretenses, representations and promises

moneys and funds for themselves and the Telemarketers under the custody or control of

the financial institutions used by plaintiffs and the members of the class.  The scheme and

artifice adversely affected banks throughout the United States.  When victims of the

fraudulent conduct alleged in this complaint complained to their banks, those banks were forced to expend resources to initiate an investigation and, when appropriate, dishonor demand drafts prepared by Netchex and PPC. In many instances, however, defendant Wachovia refused to credit those banks for funds already received by defendant Wachovia, causing them to suffer a loss, all in violation of 18 U.S.C. § 1344.

63.     18 U.S.C. § 1344 is a predicate offense for purposes of 18 U.S.C. § 1962(c).

64.     D. Hellinger, R. Hellinger, Quigley, Weisberg, and Pearlman, through Netchex and PPC, sent through, and received from, the United States mails materials as part of the scheme and artifice to defraud and obtain money for themselves and the Telemarketers by means of false and fraudulent pretenses, promises, and representations described in this complaint. Such use of the mails included by way of example:

(a)     In November 2005, PPC's regulatory counsel sent to the Attorney General of North Dakota a false statement that PPC undertook its own due diligence investigation of the Telemarketers clients, to assure that the Telemarketers were complying with applicable laws.

(b)     PPC sent to the North Dakota Attorney General documents that included scripts prepared by the Telemarketers as well as emails referring to PPC's review of those scripts.

(c)     PPC received in the mail scripts prepared by the Telemarketers including a script prepared by Advantage America in August of 2005, a script for use in a scheme known as "Dream Vacations," and a script used by Grant Information Guide.com

(d)     First Liberty, LLC, during the relevant period, was a merchant-client that used PPC's bank draft services. First Liberty shared office space, accounting systems, personnel, computers, and other equipment with PPC and provided material support for PPC's bank draft operations. The bank draft services provided by PPC to First Liberty were the result of fraudulent direct mail offers by First Liberty to consumers throughout the United States of memberships in plans that purportedly provided medical benefits, road assurances, and pharmaceutical savings.

65.     The conduct described in paragraph 64 above constituted multiple violations of 18 U.S.C. § 1341, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

66.     D. Hellinger, R. Hellinger, Quigley, Weisberg, and Pearlman, through Netchex and PPC, sent and received material by interstate and foreign wire as part of the scheme and artifice to defraud and obtain money for themselves and the Telemarketers by means of false and fraudulent pretenses, promises and representations described in this complaint. Such use of interstate and foreign wires included by way of example:

(a)     PPC advertised on its internet website the availability of its services to telemarketers as a payment processor, including its capability to process "Bank Draft originations for telephone transactions that may be prohibited by NACHA rules."

(b)     In connection with a complaint from a member of the class, an officer of PPC sent an email to a PPC telemarketing client concerning a false promise to deposit a $5000 grant into the member's account, and the charge to that account of $249.

(c)    From April 2005 to December 2005, PPC wired approximately $5.5 million obtained from fraudulent demand drafts to Telemarketer Star Communications, LLC.

(d)    From April 2005 until December 2005, PPC wired approximately $4.9 million obtained from fraudulent demand drafts to Telemarketer Consumer Reward Network.

(e)    From April 2005 to December 2005, PPC wired approximately $1.3 million obtained from fraudulent demand drafts to Telemarketer Continuity Partners.

(f)    During the period April 2005 until December 2005, PPC wired more that $5 million obtained from fraudulent demand drafts to accounts in Canadian banks, including many accounts identified only by numbers.

(g)    During the period April 2005 through October 2005, PPC transferred proceeds from the fraudulent conduct described in this complaint in the sum of at least $411,285 to Helen IT Systems.  Based on information contained in a verified complaint filed by the United States against PPC in this Court, it is believed that Helen IT Systems is a St. Lucia based company providing boiler room cold-call services to fraudulent telemarketers.

(h)    During the period between 2001 and the formation of PPC in late 2004, D. Hellinger, R. Hellinger, Quigley, Weisberg, and Pearlman, through Netchex, undertook numerous similar transfers to entities throughout the United States and abroad. Based on information contained in a verified complaint filed by the United States against PPC in this Court, these included, by way of example:

(i)       Transfers between April 2004 and August 2004 to

Consumer Grants USA.  In April 2005, the Attorney General of North Carolina filed an

action for injunctive relief against Consumer Grants USA.  On July 29, 2005, the court

entered a default judgment against Consumer Grants USA in that action.

(ii)      Transfers from March 2004 (through Netchex) until April

2005 (through PPC) to Continuity Partners.  On or about January 18, 2006, the Attorney

General of Ohio entered a Consent Judgment against Continuity Partners, which included

findings that it had engaged in fraudulent conduct against consumers, including causing

deductions from "consumers' bank accounts when those consumers did not authorize

those transactions."

(iii)     Transfers from 2001 through 2004 to at least the following

entities, all of which were the subject of government enforcement proceedings for

consumer fraud: Diversified Marketing Services, Capital Choice Consumer Credit, Inc.,

Sun Spectrum Communications Organization, Xtel Marketing Inc., 120194 Canada, Ltd.,

Frankly Speaking, and Oleg OKS.

67.     The unlawful conduct alleged above by D. Hellinger, R. Hellinger,

Quigley, Weisberg, Pearlman, through Netchex, PPC, and the Telemarketers, injured

thousands of victims, was open ended and was intended to continue and would have

continued for an indefinite period, but for the injunctive relief obtained by the United

States in *United States v. Payment Processing Center LLC, et al.*

## ALTERNATIVE ALLEGATIONS OF VIOLATIONS BY
## D. HELLINGER R. HELLINGER, QUIGLEY, WEISBERG AND PEARLMAN

68.     Plaintiffs specifically reallege that D. Hellinger, R. Hellinger, Quigley,
Weisberg and Pearlman are persons as defined in 18 U.S.C. § 1962(3).

69.     In the alternative, the enterprise was an enterprise-in-fact under 18 U.S.C.
18 U.S.C. § 1962(4) consisting of two or more of the following:  PPC, Netchex, the
Telemarketers, D. Hellinger, R. Hellinger, Quigley, Weisberg, and Pearlman.

70.     The enterprises-in-fact identified in the alternative above, maintained
substantial common management and employees and maintained substantially the same
mode of operation from the period beginning with the formation of Netchex in 2001
through February 2006, when PPC was enjoined from continuing operations as a result of
the Government Action.[1]

71.     D. Hellinger, R. Hellinger, Quigley, Weisberg, and Pearlman participated
in the conduct of the affairs of the enterprise identified in paragraph 69 above from at
least 2001 through at least February 2006 through a "pattern of racketeering activity" as
that phrase is defined in 18 U.S.C. § 1961(5).

72.     Plaintiffs specifically incorporate and reallege paragraphs 52 through 67
above.

73.     The unlawful conduct alleged above by D. Hellinger, R. Hellinger,
Quigley, Weisberg, and Pearlman, through the enterprise-in-fact injured thousands of
victims, was open ended and was intended to continue and would have continued for an

---

[1] During the period following the sale of Netchex in May 2004 through at least the
beginning of PPC in December 2004, D. Hellinger, R. Hellinger, Quigley, Weisberg, and
Pearlman all continued to be employed by Netchex and to substantially maintain the
operation until the Telemarketers could be transferred to PPC.

indefinite period, but for the injunctive relief obtained by the United States in *United States v. Payment Processing Center LLC, et al.*

## ALTERNATIVE ALLEGATIONS OF VIOLATIONS BY NETCHEX AND PPC

74.    PPC, as a limited liability corporation, is an entity capable of holding a legal or beneficial ownership interest in property and is therefore a "person" as that term is defined in 18 U.S.C. § 1961(3).

75.    Netchex, as a limited liability corporation, was capable of holding a legal or beneficial ownership interest in property, and is therefore a "person" as that term is defined in 18 U.S.C. § 1961(3).

76.    Each of the Telemarketers is a corporation or limited liability company and is therefore an "enterprise" as that term is defined in 18 U.S.C. § 1961(4).

77.    During the class period, Netchex and/or PPC were employed by, and associated with, the Telemarketers as set forth in paragraphs 19 through 30, and 52 through 67 hereof, which are incorporated herein by reference.  Payment processing provided by Netchex and/or PPC to the Telemarketers outsourced an essential function of the Telemarketers in the execution of their fraudulent schemes since it was the mechanism by which the Telemarketers received the fraudulently derived funds from plaintiffs and the members of the class.  Demand drafts were prepared by Netchex and/or PPC payable to the Telemarketers using the bank account and routing information provided to it by the Telemarketers, and were deposited into accounts maintained by defendant Wachovia for Netchex and/or PPC.  Netchex and/or PPC also provided the Telemarketers with "customer service" and "sales support."  That service and support

included review by PPC of sales scripts provided to it by the Telemarketers and representations to law enforcement officers and agencies concerning its due diligence investigation of the Telemarketers to insure compliance with applicable laws. Those reviews allegedly included review of information concerning the business histories and legal status of the Telemarketers. PPC also issued rebates, refunds, and reimbursements on behalf of the Telemarketers.

78.    The activities of PPC and/or Netchex and the Telemarketers affected interstate and foreign commerce. The fraudulent activities of the Telemarketers were directed to members of the Class throughout the United States and demand drafts prepared by Netchex and/or PPC on behalf of the Telemarketers were presented by defendant Wachovia for payment to banks throughout the United States. Fraudulently obtained funds were also wired by Netchex and/or PPC in foreign commerce to banks in Canada.

79.    PPC and/or Netchex participated in the conduct of the affairs of the Telemarketers during the class period through a "pattern of racketeering activity" as that phrase is defined in 18 U.S.C. § 1961(5).

80.    The account numbers and bank routing information fraudulently obtained by the Telemarketers from plaintiffs and the members of the Class and transmitted to PPC and/or Netchex are "access devices" as that term is defined in 18 U.S.C. § 1029(e)(1). Those access devices were obtained by the Telemarketers with intent to defraud as alleged in paragraphs 17 through 24 and 25 through 30 hereof, which are incorporated herein by reference. They were, therefore, "unauthorized access devices" as that phrase is defined in 18 U.S.C. § 1029(e)(3).

81.    The Telemarketers, individually and collectively, knowingly and with intent to defraud, trafficked in and used many thousands of unauthorized access devices identified in paragraph 80 hereof during a one-year period and by such conduct obtained funds from plaintiffs and the members of the class aggregating in the millions of dollars. The Telemarketers, individually and collectively, with intent to defraud also possessed many thousands of unauthorized access devices as described in paragraph 80 hereof.

82.    The conduct of the Telemarketers described in paragraph 81 hereof constituted multiple violations of 18 U.S.C. §§ 1029(a)(2) and (a)(3).

83.    PPC and/or Netchex, with knowledge of the criminal conduct of the Telemarketers as described in paragraphs 80 through 82 hereof, or with willful disregard thereof, agreed to provide processing services to the Telemarketers, using the fraudulently obtained access devices to prepare demand drafts and deposit them in its accounts with defendant Wachovia. PPC reviewed scripts provided to it by one or more of the Telemarketers, which it knew to be used fraudulently to obtain access devices from plaintiff and the members of the class and fraudulently represented to law enforcement officials that no charges were made to an account of a customer of the Telemarketers unless independent verification was conducted with the customer. In fact, many if not all of those supposed verifications were conducted by the Telemarketers, not PPC, and were themselves fraudulent. Notwithstanding its knowledge, and warnings received from law enforcement agencies, consumers, and banks, PPC continued with its agreements to provide processing services to the Telemarketers. Upon information and belief based upon their common ownership, employees, and mode of operation, Netchex performed services similar to those performed by PPC described above.

84.     The conduct of PPC and/or Netchex constituted multiple violations of 18 U.S.C. §§ 1029(a)(2) and (a)(3), which violations are predicate offenses for purposes of 18 U.S.C. § 1962(c).

85.     PPC and/or Netchex conspired with each of the Telemarketers to commit the offenses alleged in paragraphs 82 and 84 hereof, in violation of 18 U.S.C. § 1029(b)(2), which conspiracies are predicate offenses for purposes of 18 U.S.C. § 1962(c).

86.     The conduct of PPC and/or Netchex as described in this complaint constituted the execution of a scheme and artifice to obtain by means of fraudulent pretenses, representations and promises moneys and funds for itself and the Telemarketers under the custody or control of the financial institutions used by plaintiff and the members of the class.  The scheme and artifice of PPC and/or Netchex adversely affected banks throughout the United States.  When victims of the fraudulent conduct alleged in this complaint complained to their banks, those banks were forced to expend resources to initiate an investigation and, when appropriate, dishonor demand drafts prepared by PPC and/or Netchex.  In many instances, however, defendant Wachovia refused to credit those banks for funds already received  by defendant Wachovia, causing them to suffer a loss, all in violation of 18 U.S.C. § 1344.

87.     18 U.S.C. §1344 is a predicate offense for purposes of 18 U.S.C. § 1962(c).

88.     PPC sent through, and received from, the United States mails materials as part of the scheme and artifice to defraud and obtain money for itself and the

Telemarketers by means of false and fraudulent pretenses, promises and representations described in this complaint. Such use of the mails included by way of example:

(a)    In November 2005, PPC's regulatory counsel sent to the Attorney General of North Dakota a false statement that PPC undertook its own due diligence investigation of the Telemarketers clients, to assure that the Telemarketers were complying with applicable laws.

(b)    PPC sent to the North Dakota Attorney General documents which included scripts prepared by the Telemarketers as well as emails referring to PPC's review of those scripts.

(c)    PPC received in the mail scripts prepared by the Telemarketers including a script prepared by Advantage America in August of 2005, a script for use in a scheme known as "Dream Vacations", and a script used by Grant Information Guide.com

(d)    First Liberty, LLC during the relevant period was a merchant-client that used PPC's bank draft services. First Liberty shared office space, accounting systems, personnel, computers, and other equipment with PPC and provided material support for PPC's bank draft operations. The bank draft services provided by PPC to First Liberty were the result of fraudulent direct mail offers by First Liberty to consumers throughout the United States of memberships in plans that purportedly provided medical benefits, road assurances, and pharmaceutical savings.

89.    The conduct of PPC described in paragraph 88 above constituted multiple violations of 18 U.S.C. § 1341, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

90.     PPC and/or Netchex sent and received material by interstate and foreign wire as part of the scheme and artifice to defraud and obtain money for itself and the Telemarketers by means of false and fraudulent pretenses, promises and representations described in this Complaint.  Such use of interstate and foreign wires included by way of example:

(a)     Throughout the class period, PPC advertised on its internet website the availability of its services to telemarketers as a payment processor, including its capability to process "Bank Draft originations for telephone transactions that may be prohibited by NACHA rules."

(b)     In connection with a complaint from a member of the class, an officer of PPC sent an email to a PPC telemarketing client concerning a false promise to deposit a $5000 grant into the member's account, and the charge to that account of $249.

(c)     From April 2005 to December 2005, PPC wired approximately $5.5 million obtained from fraudulent demand drafts to Telemarketer Star Communications, LLC.

(d)     From April 2005 until December 2005, PPC wired approximately $4.9 million obtained from fraudulent demand drafts to Telemarketer Consumer Reward Network.

(e)     From April 2005 to December 2005, PPC wired approximately $1.3 million obtained from fraudulent demand drafts to Telemarketer Continuity Partners.

(f)     During the period April 2005 until December 2005, PPC wired more that $5 million obtained from fraudulent demand drafts to accounts in Canadian banks, including many accounts identified only by numbers.

41

(g)    During the period April 2005 through October 2005, PPC transferred proceeds from the fraudulent conduct described in this complaint in the sum of at least $411,285 to Helen IT Systems. Based on information contained in a verified complaint filed by the United States against PPC in this Court, it is believed that Helen IT Systems is a St. Lucia based company providing boiler room cold-call services to fraudulent telemarketers.

(h)    During the period between 2001 and the formation of PPC in late 2004, Netchex undertook numerous similar transfers to entities throughout the United States and abroad. Based on information contained in a verified complaint filed by the United States against PPC in this Court, these included by way of example:

(i)    Transfers between April 2004 and August 2004 to Consumer Grants USA. In April 2005, the Attorney General of North Carolina filed an action for injunctive relief against Consumer Grants USA. On July 29, 2005, the court entered a default judgment against Consumer Grants USA in that action.

(ii)    Transfers from March 2004 (through Netchex) until April 2005 (through PPC) to Continuity Partners. On or about January 18, 2006, the Attorney General of Ohio entered a Consent Judgment against Continuity Partners, which included findings that it had engaged in fraudulent conduct against consumers, including causing deductions from, "consumers' bank accounts when those consumers did not authorize those transactions."

(iii)    Transfers from 2001 through 2004 to at least the following entities, all of which were the subject of government enforcement proceedings for consumer fraud: Diversified Marketing Services, Capital Choice Consumer Credit, Inc.,

Sun Spectrum Communications Organization, Xtel Marketing Inc., 120194 Canada, Ltd., Frankly Speaking, and Oleg OKS.

91.    The unlawful conduct of the Telemarketers, PPC, and Netchex alleged in this complaint injured thousands of victims, was open ended, and was intended to continue and would have continued for an indefinite period, but for the injunctive relief obtained by the United States in *United States v. Payment Processing Center LLC, et al.*

## WACHOVIA'S VIOLATION OF 18 U.S.C. §1962(d)

92.    With knowledge of PPC's deceptive, fraudulent and unlawful conduct as alleged herein, defendant Wachovia conspired with  PPC, Netchex, D. Hellinger, R. Hellinger, Quigley, Weisberg, and Pearlman, or one or more of them, to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

93.    Wachovia joined the conspiracy at least as early as March 2005, when it opened accounts for PPC, but likely knew of the activities of the illegal enterprises much earlier and may have joined the conspiracy as early as June 6, 2003, when it opened accounts for Netchex, an entity servicing telemarketers, notwithstanding the fact that it was founded and controlled by D. Hellinger, who Wachovia knew, or should have known, had been convicted of tax evasion based upon consumer fraud and been the subject of multiple consumer fraud actions by governmental entities.

94.    Wachovia knew that PPC was engaged in servicing fraudulent activity by the Telemarketers and was using Wachovia accounts to service such fraud but opened accounts for PPC and did not close any accounts.  Wachovia opened and continued to service the accounts to obtain the revenue which it knew, or should have known, was

derived from the fraudulent scheme it had joined.  The accounts were ultimately frozen as a result of the actions of this Court.

95.     As early as 2003, defendant Wachovia acknowledged in its publication "A Guide to Checks and Check Fraud" that "demand drafts have been used by deceptive telemarketers who obtain bank account information and withdraw unauthorized funds from consumers' bank accounts, without their realizing that such withdrawals are occurring…."

96.     D. Hellinger was a member of PPC and established accounts and business agreements between PPC and its merchant-clients such as the Telemarketers.

97.     As described in paragraph 7 above, D. Hellinger had an extensive record of consumer fraud.

98.     In September 2004, well before it opened any accounts in the name of PPC, defendant Wachovia prepared a due diligence report concerning D. Hellinger, which disclosed articles concerning a coupon scam in 1989 and a "900" telephone-line scam in 1991 involving D. Hellinger; that D. Hellinger had pled guilty in October 1989 to criminal charges relating to the coupon scam; and that the Federal Trade Commission had filed an action against a company owned by D. Hellinger for deceptively promoting credit cards and other products by use of "900" telephone numbers.  Although defendant Wachovia's investigator was able to correctly match Donald Hellinger's birth date and tax identification number, its due diligence report concluded that its "investigation could not positively identify the accused entity or company to be that of our customer."

99.     Hellinger's home, Netchex, and PPC all were located at addresses within a ten-mile radius of each other in lower Bucks County, Pennsylvania.

100.    Wachovia had extensive knowledge of the activities of D. Hellinger and his cohorts Quigley, Pearlman, Weisberg, and R. Hellinger even before receiving this report, because Wachovia had, beginning at least as early as June 6, 2003, opened accounts for Netchex.

101.    On or about June 6, 2003, Wachovia opened Bank Account No. 2000011522041 as a depository account for Netchex. Between then and August 2004, Netchex deposited approximately $58 million into that account. The deposits ranged from $100,000 to $300,000 and consisted of thousands of demand drafts drawn on the accounts of consumers at the direction of numerous telemarketers. This account experienced very high numbers of returned items.

102.    Upon information and belief, during the period subsequent to June 6, 2003, but prior to the time it ultimately opened accounts for PPC, Wachovia received numerous communications from other banks regarding returns of drafts issued by Netchex.

103.    Routine due diligence by Wachovia would have revealed that many of the telemarketers being served by Netchex were the subjects of consumer fraud actions brought by government regulators during the period that the account was open. These included:

(a)    *FTC v. Diversified Marketing Services, et al.*, Civ. No. 96-388 M (W.D. Okla 1996);

(b)    *FTC. v. H.G. Kuykendall, Jr. et al.*, Civ-96-388-M (Motion for Contempt, January 2002; Stipulated Order for Contempt, Feb. 22, 2005);

(c)    *FTC v. Capital Choice Consumer Credit, Inc., et al.*, No. 02-

21050-CIV (S.D. Fla 2002);

      (d)    *FTC v. Sun Spectrum Communications Organization, et al.*, No. 03-81105-CIV (S.D. Fla. 2003);

      (e)    *FTC v. Xtel Marketing, Inc., et al.,* No. 04C 7238 (N.D. Ill. Nov. 19, 2004);

      (f)    *FTC v. 120194 Canada, Ltd., et al.,* ("Prime One"), No. 04C 7204 (N.D. Ill. Nov. 8, 2004);

      (g)    *FTC v. Frankly Speaking, et al.,* Civ. No. 1:05-CV-60 (WLS) (M.D. Ga. 2005);

      (h)    *FTC v. Oleg OKS, et al.*, No. 05C 5389 (N.D. Ill. September 19, 2005);

      (i)    *North Carolina v. Consumer Grants USA, Inc. et al.*, No. 05 CVS 04732 (Wake County, NC).

    104.    In fact, Wachovia was further aware of the abuses by payment processors for telemarketers because it had served other payment processors who ran afoul of government regulators because of their servicing of telemarketers. These included Amerinet which, in response to proceedings brought by the attorneys general of Ohio, Florida, Illinois, North Carolina, and Vermont, agreed in November 2005 to cease processing unsigned demand drafts because of their high rate of abuse by telemarketers

    105.    Notwithstanding its actual knowledge and the knowledge and information available to it as alleged above, on March 24, 2005, defendant Wachovia, opened account 2000018538232 (the '232 Account) for PPC by which PPC was able to process the fraudulent demand drafts generated on behalf of the Telemarketers.

106.    By May of 2005, Tim Brady a manager of the Wachovia Loss Management Department in Wachovia's Charlotte headquarters, responsible for, among other things, investigations of possible fraud, recommended against maintaining accounts for PPC.  Brady understood that PPC serviced telemarketers and that PPC's Wachovia accounts would be used to advance fraudulent activity.

107.    Wachovia did not heed Brady. Rather, because it was on notice that the PPC drafts could be, and likely were, the product of fraudulent telemarketing schemes, and because of the high level of returned drafts it was receiving in the PPC accounts, which further alerted it to the fraudulent activity, in May and June of 2005, Wachovia sought to insulate itself from the risk of financial losses while maintaining the revenues generated by PPC's activities.  To the end, Wachovia entered into a series of agreements with PPC, including oral agreements, giving defendant Wachovia expanded refund and charge-back rights against PPC in excess of those provided to it by the Uniform Commercial Code.

108.    Linda Mill, Senior Vice President for Deposit Risk Operations of Wachovia testified that in May 2005, Wachovia entered into an oral agreement with PPC that provided substantial additional rights to Wachovia beyond those contained in the Uniform Commercial Code.  The agreement provided that Wachovia would accept all returned items regardless of when they came in. As discussed in paragraph 121 below, such an agreement was a clear indication that Wachovia understood that its customer was servicing fraudulent telemarketers.

109.    In June 2005, Wachovia required a further written agreement from PPC providing Wachovia, among other things, complete indemnifications from PPC and other rights and protections beyond those accorded by the Uniform Commercial Code.

110.    The return rate on PPC demand drafts was extremely high. Between April and December 2005, PPC deposited demand drafts totaling approximately $88 million in the '232 Account.  However, during that same period, the account had an extremely high return rate. Of the $88 million deposited, the return rate on a dollar basis was 60% or $52.8 million.

111.    The extremely high return rate on the '232 Account put defendant Wachovia on further notice that PPC was engaged in preparing and processing demand drafts using fraudulently obtained bank account information.  For example, major credit card systems such as Visa and MasterCharge, of which Wachovia is a member, will terminate merchants with rejection rates of only two and three percent.  Indeed, in September 2005, defendant Wachovia informed law enforcement authorities that it was investigating suspicious activity in the '232 Account.

112.    Notwithstanding its knowledge that PPC was engaged in suspicious activities involving demand drafts as alleged above, on September 27, 2005, Wachovia opened account 2000018853548 for PPC (the '548 Account) by which PPC was able to process the fraudulent demand drafts generated on behalf of the Telemarketers, which account was also subject to the agreements described in paragraphs 108 through 109 hereof.

113.    In two months, November and December 2005, PPC deposited demand drafts into the '548 Account totaling approximately $54 million.  The return rate on that

account was 58% or more than $31 million, putting defendant Wachovia on further notice
that PPC was engaged in preparing and processing demand drafts using fraudulently
obtained bank account information. Nonetheless, on December 27, 2005, defendant
Wachovia opened account 200018853797 for PPC, which account was also subject to the
agreements described in paragraphs 108 through 109 hereof.

114.    An employee of defendant Wachovia described the volume of returned
demand drafts processed by PPC as "tremendous" and acknowledged that defendant
Wachovia had created a process for handling them that was different than its ordinary
process for handling returned items.

115.    Upon information and belief, the returned items received by Wachovia
included what are known as "with entry" returns and "without entry" returns. "With
entry" returns are items returned promptly within specified time periods which are
accepted. The returned amounts are credited without any need for further documentation.
"Without entry" items are items that are returned subsequent to the specified time
periods. In such instances, the returned item is generally accompanied by affidavits from
the account holder from whose account the funds on the demand draft were withdrawn.
These affidavits will certify that the demand draft was issued without appropriate
authorization or that it involved a fraudulent inducement.

116.    Upon information and belief, many demand drafts issued by PPC were
returned to Wachovia *without entry* accompanied by affidavits of account holders
certifying that the demand drafts were issued without authority or as a result of fraudulent
inducement. Such demand drafts were returned during the period from the time
Wachovia opened the PPC accounts until the Government Action. Upon information and

belief, as a result of said affidavits, Wachovia knew that the PPC accounts were being used to service fraudulent activity.

117.    In total, defendant Wachovia agreed to open and opened at least eight different accounts for PPC, all of which were subject to the agreements described in paragraphs 108 through 109 hereof, notwithstanding its knowledge of the information set forth above.

118.    In January 2006, David Mowry, the Senior Vice President/Director of Legal Services of Citizens Bank, wrote to put defendant Wachovia on notice that it was being flooded by unauthorized bank drafts originated by PPC, and asking for defendant Wachovia's "assistance in trying to shut down this scam…." Mowry specifically requested "that you kindly instigate investigation into whether PPC is conducting legitimate business and whether Wachovia's getting a high volume of return items on those accounts. That should place you on notice of potential fraud."

119.    Even though Defendant Wachovia already knew of the massive returns that it was receiving in the various PPC accounts, Wachovia responded that "overzealous" telemarketers were responsible for the problems with the PPC bank drafts, but nonetheless continued to accept such drafts from PPC.

120.    Defendant Wachovia received similar complaints from other banks.

121.    Internally, Wachovia's own legal department warned against maintaining accounts like those of PPC, particularly those including agreements like those that Wachovia had executed with PPC. Elisa Barbis of the Wachovia loss-prevention unit with responsibility for detecting fraud wrote:

> Please take the time to scrutinize your customers' practices and policies to ensure that they are scrubbing any

> unscrupulous telemarketers from their list. If your customer
> has in place a standing agreement with Wachovia to pay all
> claims without dispute, then they know that they have a
> rogue telemarketer in their customer base.

122.     Wachovia's special agreements with PPC had precisely such a provision

to pay all claims without dispute, yet despite this internal advice, the complaints from

other banks, the warnings from a senior officer of Citizen's Bank and the empirical

experience of massive returns, Wachovia continued to maintain and service the PPC

accounts.

123.     At no time did Wachovia ever close any of the PPC accounts.  The

accounts were ultimately frozen by action of this Court.

124.     Notwithstanding its knowledge that PPC was engaged in unlawful activity

as described herein, defendant Wachovia continued with its agreement to provide

banking services to PPC involving fraudulently created demand drafts, subject to the

agreement described in paragraphs 108 through 109 hereof, until February 21, 2006,

when a temporary restraining order was issued by this Court against PPC.

125.     The banking services provided by defendant Wachovia were, and

defendant Wachovia knew they were, an essential element in the scheme of PPC and the

Telemarketers to fraudulently obtain funds from the bank accounts of plaintiffs and the

members of the class.

126.     For the reasons stated above, defendant Wachovia was on notice of and

knew of the unlawful scheme being perpetrated by PPC as alleged herein, but nonetheless

conspired and agreed to facilitate that scheme, and by continuing to accept demand drafts

prepared by PPC, committed acts in furtherance of that scheme, all in violation of 18

U.S.C. § 1962(d).

127.    Plaintiffs and the members of the class were the intended targets of the scheme that was facilitated by the knowing and purposeful involvement of Wachovia. The financial harms suffered by plaintiffs and members of the class were by reason of said conduct and were the reasonably foreseeable consequence of such conduct.

**WHEREFORE**, plaintiffs demand judgment against defendant Wachovia for threefold the damages suffered by them and the members of the class as a result of Wachovia's unlawful conduct alleged herein, together with the costs of this action and a reasonable attorney's fee.

Langer & Grogan, P.C.

By:    _____

Howard Langer
Judah I. Labovitz
John Grogan
Irv Ackelsberg
Edward Diver
LANGER & GROGAN, P.C.
1717 Arch Street
Suite 4130
Philadelphia, PA 19103
215-320-5660

Attorneys for Plaintiffs and the Class

August 13, 2007

## <u>CERTIFICATE OF SERVICE</u>

I, Howard Langer, hereby certify that a true and correct copy of the foregoing

Second Amended Complaint/Class Action was caused to be served this 13 th day of

August 2007 via hand delivery upon the following:

Wilbur L. Kipnes, Esquire
Schnader Harrison Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286

FILED

MICHAEL KUNZ, Clerk
By_____Dep. Clerk

Howard I. Langer